Jeanette CORDES, Appellant–
Respondent,

v.

Jack D. WILLIAMS; Respondent–
Appellant,

and

Andrew H. Williams, Respondent.

Nos. WD 65257, WD 65297.

Missouri Court of Appeals,
Western District.

Sept. 26, 2006.

Michael L. McDorman, Versailles, MO, for appellant-respondent.

Virgil D. Rodgers, II, Tipton, MO, for respondent-appellant.

William E. Quirk, Kansas City, MO, for respondent, Andrew Williams.

Charles E. McElyea, Camdenton, MO, for respondent, Carrie Williams.

Before RONALD R. HOLLIGER, P.J., HAROLD L. LOWENSTEIN, and ROBERT G. ULRICH, JJ.

ROBERT G. ULRICH, Judge.

Two petitions were filed in the underlying probate case, ultimately seeking determination of the amount eleven living siblings will receive from the estate of their deceased mother. The petitions were consolidated for trial. Both petitions were filed by Jeanette Cordes, the first seeking the court's judgment removing brother, Jack Williams, as personal representative of the estate of Carrie C. Williams, deceased. The second petition named both Jack Williams and Andrew Williams as parties Respondent and was entitled Amended Petition for Discovery of Assets. This petition sought production of a promissory note Jeanette Cordes claims is owed the estate. Jeanette Cordes appeals, and Jack Williams cross appeals the judgment of the Probate Division removing Jack as personal representative of the estate of

Carrie C. Williams, deceased, and ordering that Jack's share of the estate as an heir be offset by the unpaid balance of a promissory note signed by Jack, Andrew Williams, and their spouses, which the court declared is owed to the estate. The trial court found that Andrew's obligation to the estate on the note was extinguished before the death of the decedent with her knowledge. Jeanette asserts one point on appeal, Jack asserts six points, and Andrew rebuts Jeanette's claims without posturing a cross appeal. The judgment is affirmed in part, and the case is remanded.

## Facts

Carrie Williams[1] died on January 22, 2000, at the age of 94 years. On March 29, 2000, Jeanette applied for letters of administration, asserting that no Last Will and Testament had been produced. Jack submitted Carrie's Last Will and Testament (Will) to the court, however, and Jack applied for letters testamentary or of administration on March 31, 2000. The Will identified Jack as Carrie's choice to be personal representative. The Will was ordered admitted to probate as the Last Will and Testament of Carrie Williams on April 19, 2000, and letters testamentary were granted to Jack, appointing him personal representative.

Carrie had twelve children, one of whom was deceased when Carrie died. Carrie's Will divided her estate equally between her eleven living children. Jeanette Cordes, Jack Williams, and Andrew Williams are three of Carrie's eleven surviving children and are heirs of the estate.

On June 13, 2002, pursuant to section 473.140, Jeanette filed a Petition for Removal of Personal Representative, naming Jack as Respondent, and later filed a First Amended Petition.[2] The petition alleged that Jack failed to execute his duties as personal representative and listed a number of alleged deficiencies in Jack's performance. The allegations related to, among other things, Jack's failure to inventory or collect on a promissory note.

On August 22, 2002, Jeanette filed a Petition for Discovery of Assets, naming Jack and Andrew as Respondents. Jeanette filed an Amended Petition for Discovery of Assets on January 6, 2003. The petition alleged that Carrie owned certain property at the time of her death, including a promissory note, which was being withheld from the estate.

A contract was executed on November 24, 1970, whereby Carrie agreed to sell R.V. Williams Lumber and Building Materials Company, Inc., the family business, to Jack and Andrew for $117,447.87. Jack, Andrew, and Jack and Andrew's wives, signed the promissory note referenced by Carrie's petition, payable to Carrie as a mechanism to finance the purchase of the business. On August 1, 1971, Jack, Jack's wife, Andrew, and Andrew's wife executed the promissory note in favor of Carrie in the amount of $117,447.87. The promissory note states the following:

> For Value Received we Promise to Pay to the Order of Carrie C. Williams One Hundred Seventeen Thousand Four Hundred Fifty–Seven Dollars and 87/100 DOLLARS in 19 consecutive annual Installments of $6,000.00 DOLLARS each on the 1st day of each and every August beginning with August 1, 1971 and a final installment of $3,457.87 due on August 1, 1990, with interest at the rate of

---

1. Given that several of the parties relevant to this action have the same last name, all persons will be referred to by their first names. No disrespect is intended.

2. All statutory references are to RSMo 2000 unless otherwise stated.

6 percent per annum from date payable after maturity on the unpaid balance from time to time due. The Interest is not included in the Installments.

The Petition for Discovery of Assets alleged that Jack and Andrew remain obligated under the promissory note and are adversely withholding and concealing the promissory note from Carrie's estate. The petition also alleged that Jack has utilized estate assets for his personal benefit and that he has sold estate property without accounting for the proceeds of the sales. Jeanette sought discovery of the personal and real property belonging to Carrie at the time of her death and asked the court to determine the title and right of possession thereto, determine the persons who have an interest in the property together with the nature and extent of such interest, direct transfer of estate property to an Administrator Ad Litem, and render judgment in favor of Carrie's heirs against Jack and Andrew for all losses, expenses, and damages.

Jack filed an answer to the Amended Petition for Discovery of Assets and a cross complaint on January 14, 2003. The cross complaint alleged that Jeanette converted $15,000 in jewelry that belongs to the estate. Andrew filed an answer on March 25, 2003, denying Jeanette's allegations.

Trial was had on January 25, 2005.[3] Jeanette had requested that the trial court make findings of fact and conclusions of law. The Probate Division rendered its judgment on March 3, 2005. The trial court made the following relevant findings of fact:

On August 1, 1971, Jack and Andrew, along with their wives, executed a promissory note for the principal sum of $117,447.87 in favor of Carrie for the purchase of R.V. Williams Lumber and Building Materials Company, Inc.

The principal balance of the promissory note accrued interest from August 1, 1971, at the rate of 6% per annum and that interest was payable after maturity of the promissory note on August 1, 1990.

The unpaid principal balance remaining on the note at the time of Carrie's death was $20,660.42.

No interest payments were made on the promissory note, and the total amount of

---

**3.** There is some suggestion in the briefs that the judgment rendered is only for the petition for the removal of personal representative and not for the petition for discovery of assets. This is because the judgment states that trial was had on the petition for removal of personal representative. Although this court is unable to locate the docket entry indicating that the First Amended Petition for Removal of Personal Representative and the Amended Petition for Discovery of Assets were consolidated, the transcript makes clear that the trial court heard evidence pertaining to and decided the issues raised under both petitions. Both the trial judge and the parties explicitly referenced both petitions.

Further, Andrew was only a respondent in the petition for discovery of assets. Jack was the sole respondent in the petition for removal of personal representative. Andrew was present as a party at the hearing, was represented by counsel, and participated in the trial, questioning witnesses and making objections. Thus, his involvement was limited to the petition for discovery of assets.

Moreover, the judgment itself reflects that it is rendered as to both the petition for removal of personal representative and the petition for discovery of assets. It discovered assets in that it determined that the promissory note was an asset of the estate and determined its value. It also removed Jack as personal representative. Thus, it afforded Jeanette the relief requested in both of her petitions.

The statement in the judgment that trial was had as to the petition for removal of personal representative was a typographical error. Trial was had, and judgment was rendered, as to both petitions.

interest due and owing as of the date of Carrie's death was $79,919.71.

The total value of the note on the date of Carrie's death was $100,580.13.

Any obligation Andrew had on the promissory note executed in favor of Carrie was extinguished upon the transfer by Andrew of all of his ownership interest in R.V. Williams Lumber and Building Materials Company, Inc. to Jack and the transfer occurred with the knowledge of Carrie many years prior to her death.

As recently as March 31, 2004, the promissory note owed to Carrie was still listed as a liability with a principal value of $20,660.42 on the balance sheet of R.V. Williams Lumber and Building Materials Company, Inc., and since 1998, no further payments have been made on the principal balance of the note.

Jack, in his capacity as personal representative of Carrie's estate, failed to inventory the promissory note or to make any attempt to collect the promissory note on behalf of the estate.

An action to collect on the note could have been brought on behalf of the estate prior to August 1, 2000; however, after that date an action to collect on the note would be barred by the applicable statute of limitations.

The total value of the property owned by Carrie at the date of her death including the value of the promissory note exceeded $675,000.

Jack, in his capacity as personal representative of Carrie's estate, failed to file federal and state estate tax returns in a timely manner and further failed to file a request for an extension of time to file federal and state estate tax returns on behalf of the estate.

The trial court made the following relevant conclusions of law:

The share of Carrie's estate to which Jack is entitled is subject to offset for the amount of the indebtedness owed under the promissory note pursuant to the doctrine of equitable retainer as codified by section 473.630, which provides that when a distributee of an estate is indebted to the estate, the amount of indebtedness may be treated as an offset against any property of the estate to which the distributee is entitled; this is true even if the note is later barred by the running of the statute of limitations to collect on the note.

Pursuant to section 473.270, Jack, acting in his capacity as personal representative for Carrie's estate, had a duty to collect all money and debts of every kind due to the decedent.

Pursuant to IRS Code section 2010(c), estates of decedents dying during the year 2000 valued at greater than $675,000.00 were required to file a Federal and State Estate Tax Return.

An estate that fails to file Estate Tax Returns timely or to file requests for an extension of time is subject to penalties and interest on any tax which is subsequently due from the estate.

Jack breached his duty to act as personal representative and is subject to removal as personal representative of Carrie's estate pursuant to section 473.140 for failing to discharge his official duties, in that: (a) he failed to inventory the promissory note or to take any steps to collect the money due and owing under the promissory note and (b) he failed to timely file Federal and State Estate Tax Returns required to be filed by law, subjecting the estate to penalties and interest charges.

Pursuant to section 473.153.6, the compensation of Jack as personal representative may be denied for his failure to

properly discharge his duties during the administration of Carrie's estate.

Jack's cross claim is dismissed with prejudice.

The judgment removed Jack as personal representative, ordered that the estate compensate neither him nor his attorney, and ordered any compensation already paid by the estate refunded to the estate. It further ordered that the promissory note is to be included as an asset of the estate with a value as of the date of Carrie's death of $100,580.13. It also ordered that Jack's share of Carrie's estate be offset by the value of the promissory note. Finally, the judgment appointed the Administrator Ad Litem as the personal representative of the estate. Costs for the action to remove Jack as personal representative were taxed against Jack.

## Standard of Review

■ *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976), articulates the standard of review. *Estate of Herbert v. Herbert*, 152 S.W.3d 340, 344 (Mo.App. W.D. 2004); *Cook v. Barnard*, 100 S.W.3d 924, 927 (Mo.App. W.D.2003). "Consequently, the decree or judgment of the probate court will be sustained by the appellate court unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law." *Herbert*, 152 S.W.3d at 344.

## Jack Williams' Point I

■ In his first point on appeal, Jack argues that the trial court erred in finding that the principal balances of the promissory note accrued interest from August 1, 1971, at the rate of six percent per annum. He asserts that the trial court's finding is not supported by substantial evidence, is against the weight of the evidence, and

erroneously declares and applies the law. He argues that interest was payable after maturity of the promissory note on August 1, 1990. He claims that the promissory note was structured in such a manner that interest would only occur in the event that the principal balance was not paid off and a balance was left owing after the maturity date of the promissory note.

At trial, a certified public accountant testified to various calculations made on the promissory note. The accountant was asked to assume various amounts of principal were still due under the promissory note and to calculate interest owed for each suggested amount of principal. One of the calculations was based upon a scenario wherein there was a promissory note of $117,457.87, bearing interest at six percent, with annual payments of $6,000 applied to principal. The accountant further assumed that, as of 1988, the principal had been paid down to $20,660.42. The accountant assumed interest stopped accruing in 2000, when Carrie died. The accountant testified that, under this scenario, there would be $20,660.42 due on the principal and $79,919.71 due in interest for a total of $100,580.13 owed under the promissory note. These are the exact numbers used by the trial court in its judgment. Jack now claims that interest was calculated incorrectly.

At no time did Jack, or any party, question how interest was calculated under the promissory note. The accountant calculated the interest for several different principal balances. Throughout the trial, Jack questioned or took issue with what amount of principal, if any, was outstanding under the promissory note. He never objected or questioned the accountant regarding how the interest was calculated for each assumed principal due, though.

The dispute at trial was whether an obligation expressed in a promissory note

exists and, if it does, what amount of principal is still due and owing. How interest would be calculated on any amount of principal the trial court determined still outstanding was not disputed, however. Jeanette presented the accountant's testimony as evidence of what the amount of interest would be for the various asserted principal balances, and none of the parties objected to the method expressed for determining the accrual of interest from August 1, 1971. No other manner of calculating interest was asserted.

Jack now complains that interest was calculated incorrectly. He asserts that, regardless of the principal balance the trial court determined to be outstanding, interest should not have accrued from August 1, 1971.[4] Instead, he argues that interest should accrue from August 1, 1990. This argument was not presented to the trial court and is consequently not preserved for appellate review. *Hammond v. Mun. Corr. Inst.,* 117 S.W.3d 130, 136 (Mo.App. W.D.2003).

■ Jack also notes that the original promissory note was never produced at trial, its whereabouts are unknown, and the promissory note entered into evidence was an unsigned copy. He does not explain the legal significance of this observation. Neither does Jack raise as a point on appeal any argument pertaining to the fact that a signed copy of the promissory note was not introduced as evidence. "Issues not encompassed by the point relied on and raised only in the argument portion of the brief are not preserved for review." *Pearson v. Pearson,* 22 S.W.3d 734, 739 n. 4 (Mo.App. W.D.2000) (internal quotation marks and citation omitted).

Point denied.

## Jack Williams' Point II

■ In his second point on appeal, Jack asserts that the trial court erred in finding that he owed an unpaid principal balance of $20,660.42 to Carrie at the time of her death. He claims that the trial court's finding is not supported by substantial evidence, is against the weight of the evidence, and erroneously declares and applies the law. He argues that no evidence reveals how that sum of $20,660.42 as the unpaid principal was calculated and that the amount is neither consistent with any method of calculation consistent with the provisions of the promissory note nor with the evidence of payments made to satisfy the obligation.

■ The figure of $20,660.42 as the value of the promissory note was reflected in two balance sheets of the company, constituting part of the financial records of R.V. Williams Lumber and Building Materials Company, Inc. The 1988 financial statement, with a balance sheet dated December 31, 1988, and a balance sheet, dated March 31, 2004, of R.V. Williams Lumber and Building Materials Company, Inc. were admitted into evidence. They listed liability in the amount of $20,660.42, and Jack identified the liability as the obligation expressed in the promissory note. Jack argues, however, that the financial statements were admitted as evidence at trial for the limited purpose of showing only that an obligation documented by the promissory note existed. He notes the rule that when evidence is offered for one purpose only, it may not be used for another and different purpose. *In re Estate of Danforth,* 705 S.W.2d 609, 610 (Mo.App. S.D.1986). Because of this rule, he asserts that the trial court's use of the financial

---

4. In this point, Jack is not arguing that the principal amount the trial court found to be outstanding is error; he is only arguing that

the method of calculating interest, regardless of the principal balance, is error.

statements as evidence to determine an amount of the obligation still owed was improper.

The 1988 financial statement was offered to show the balance owed to satisfy the promissory note in 1988. None of the parties objected to its admission for that purpose. Andrew's counsel objected to the 1988 financial statement representing the balance owed on the promissory note at the time of Carrie's death but explicitly stated that he did not object to the financial statement representing the balance owed in 1988. Thus, the 1988 financial statement was not admitted for a limited purpose.

The testimonial evidence Jack cites in support of his argument that the trial court admitted the financial statement and balance sheet for a limited purpose pertains to the admittance of the 2004 balance sheet. Jack and Andrew undisputedly entered into a promissory note in 1971 whereby they were obligated to Carrie. Whether they were still obligated at the time of Carrie's death, however, was disputed. This dispute arose, in part, because the original promissory note could not be located. The promissory note admitted at trial was an unsigned copy. No record of payments made to satisfy the promissory note was presented at trial. According to the terms of the promissory note, it was to be paid in full in 1990, ten years before Carrie's death.

Jeanette bore the burden of proving that, at the time of Carrie's death, an outstanding balance was due under the promissory note. She endeavored to do this by presenting several items constituting circumstantial evidence. One of these items was the 2004 balance sheet, which listed a liability in the amount of $20,660.42. Jack identified this liability as money owed under the promissory note. Jack testified that the liability was listed erroneously and that it should have been removed from the balance sheet nearly twenty years prior, when he claims Carrie forgave the outstanding balance due under the promissory note. Now, Jack argues that the 2004 balance sheet was admitted for the limited purpose of showing that an obligation was still owed under the promissory note, not the amount owed. He further argues that, because of this limited admittance, the trial court improperly used the amount listed as a liability on the balance sheet as the amount of the obligation still owed.

Jack's contention is errant. When ruling upon whether the balance sheet was admissible, the trial court noted that it was dealing with the discovery of assets proceeding and was attempting to determine whether an asset of the estate was being concealed. The trial court admitted the balance sheet as circumstantial evidence that an asset was being concealed, namely an obligation owed pursuant to the promissory note. The balance sheet was evidence of an asset, its existence and nature. The trial court never limited the admission of the balance sheet in such a manner that it was to be used to show there was an obligation, but not to show the nature of the obligation. The trial court stated:

I'm going to allow Exhibit 7 [the 2004 balance sheet] in. Again, the evidence— This is a discovery of assets proceeding. And sometimes the only way you can get to that is through circumstantial evidence. Again, I'm not saying it— . . . — proves that the note was still in existence at the date of death, although this is four years after the date of death. So I'm going to allow Exhibit 7 in for that purpose.

The trial court's consideration of the 2004 balance sheet as evidence that an obligation in the amount of $20,660.42 existed was not error.

Jack also argues that admission of the financial statements was error because section 490.680 was not satisfied. Section 490.680 states the foundational requirements for admitting records as competent evidence, and states:

A record of an act, condition or event, shall, insofar as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission.

Thus, Jack is arguing that a proper foundation allowing admission of the records was not laid. He does not raise this issue in his point relied on. "Issues not encompassed by the point relied on and raised only in the argument portion of the brief are not preserved for review." *Pearson*, 22 S.W.3d at 739 n. 4 (internal quotation marks and citation omitted).

Jack further argues that R.V. Williams Lumber and Building Materials Company, Inc. is a corporation and, as such, is a separate legal entity. Because it is a separate legal entity, Jack claims it should have been a party to the proceeding if its records were to be admitted into evidence for proof of the amount of debt owed. Neither is this issue asserted in his point relied on. "Issues not encompassed by the point relied on and raised only in the argument portion of the brief are not preserved for review." Id. (internal quotation marks and citation omitted).

Point denied.

## Jack Williams' Point III

In his third point on appeal, Jack argues that the trial court erred in determining that interest accrued from August 1, 1971, at the rate of six percent per annum and payable after maturity of the promissory note on August 1, 1990, and that, at the time of Carrie's death, $79,919.71 was interest owed and unpaid. He asserts that the trial court's finding is not supported by substantial evidence, is against the weight of the evidence, and erroneously declares and applies the law. He argues that the promissory note calls for interest to be paid only on any balance that remains unpaid after the maturity date of August 1, 1990, and that there is no basis to calculate interest back to 1971. He also argues that, under any scenario, the interest owing would be less than $79,919.71.

This assertion is a restatement of Jack's arguments expressed in Point I, that interest did not accrue until after maturity, and in Point II, that the principal amount upon which interest accrued was incorrect. These arguments are denied for the reasons stated in Points I and II.

Point denied.

## Jack Williams' Point IV

In his fourth point on appeal, Jack argues that the trial court erred in determining that the value of the promissory note on the date of Carrie's death was $100,580.13 and that the promissory note should be included as an asset of Carrie's estate. He asserts that the trial court's finding is not supported by substantial evidence, is against the weight of the evidence, and erroneously declares and applies the law. He also claims that the promissory note was barred by the statute of limitations, which extinguished the legal ability to enforce the obligation prior to Carrie's death. In the alternative, he claims that the promissory note was extinguished by Carrie's renunciation prior to her death. In the alternative, he claims the promissory note and the debt were

cancelled prior to Carrie's death. He also claims, alternatively, that Carrie waived the obligation secured by the promissory note.

Jack argues that enforcement of the promissory note was barred by the statute of limitations at the time of Carrie's death and, thus, cannot be considered an asset of the estate. He also argues waiver. Jeanette argues that Jack failed to raise these two affirmative defenses at the proper time, and that failure to plead any affirmative defense at the proper time results in a waiver of the defense and the trial court and appellate court may no longer consider the issue. She cites Rule 55.08, which states in part that "a party shall set forth all applicable affirmative defenses and avoidances, including but not limited to . . . release, . . . statute of limitations, . . . waiver . . . and any other matter constituting an avoidance or affirmative defense." While Rule 55.08 may not always apply in discovery of asset cases in the Probate Division of the Circuit Court, the probate court in this case entered a specific order that all Supreme Court Rules 41 through 117, inclusive, applied. *See* § 472.141; Rule 41.01.

Jack does not dispute that he failed to raise the affirmative defenses of statute of limitations and waiver or that he was required to do so by order of the trial court. He presents two responses, however. First, he argues that Jeanette, too, failed to plead certain affirmative defenses and, thus, cannot complain that he did the same. He cites no authority that such argument exonerates his failure, however, and this argument unpersuasive. Second, he argues that evidence pertaining to the affirmative defenses was presented at trial without objection and, consequently, the pleadings were amended to conform to the evidence. *See, e.g., Shuler v. Premium Standard Farms, Inc.,* 148 S.W.3d 1, 6

(Mo.App. W.D.2004). Jack fails to cite transcript pages of the trial in support of his assertion that evidence pertaining to the statute of limitations and waiver was presented without objection, thus amending the pleadings. Review of the transcript does not disclose the presentation of any such evidence. The affirmative defenses were not properly pleaded. Because Jack failed to plead the affirmative defenses of statute of limitations and waiver, he cannot claim on appeal that enforcement of the provisions expressed in the promissory note were barred by the statute of limitations or that a waiver occurred. *Wallace v. Grasso,* 119 S.W.3d 567, 575 (Mo.App. E.D.2003).

Jack also argues that renunciation occurred pursuant to section 400.3–604(a). Section 400.3–604(a) states the following:

(a) A person entitled to enforce an instrument, with or without consideration, may discharge the obligation of a party to pay the instrument (i) by an intentional voluntary act, such as surrender of the instrument to the party, destruction, mutilation, or cancellation of the instrument, cancellation or striking out of the party's signature, or the addition of words to the instrument indicating discharge, or (ii) by agreeing not to sue or otherwise renouncing rights against the party by a signed writing.

Jack asserts two theories for a renunciation having occurred. The first is gratuitous renunciation or voluntary forgiveness of the debt. The second is that the obligation memorialized by the promissory note was discharged by destruction of the promissory note.

Jack's first renunciation argument is that the debt was voluntarily forgiven in accordance with section 400.3–604(a)(ii). He testified at trial that Carrie told him that he did not need to make further payments under the promissory

note, and he asserts that this constituted Carrie's gratuitous forgiveness of the debt. He notes that section 400.3–604(a)(ii) requires a signed writing, but argues that a signed writing is not required in this case. Whether a signed writing is required in this case need not be addressed, however. The evidence at trial that Carrie voluntarily forgave the obligation under the promissory note was Jack's testimony. The only other possible evidence supporting Jack's assertion that Carrie voluntarily forgave the obligation was the testimony of Betty Meyers, another of Carrie's children and an heir. Betty testified as follows:

Q. Ms. Meyers, did you have a discussion with your mother, Carrie Williams, about any debt that was owed to her by Jack Williams?

A. Yes.

Q. And what was that discussion?

A. Well I told her what I had heard, that Jack hadn't paid for the lumberyard. And her words were, "It's nobody's damn business whether I—what I got for the lumberyard, but it's done."

. . . .

Q. Exactly what did she tell you about any debt that Jack to her?

A. Nothing, other than the fact that it was nobody's damn business how much she got for the lumberyard. It was all done.

Thus, the evidence presented that Carrie forgave the obligation consisted of Jack's testimony and Betty's testimony. Betty's testimony is equivocal; she testified that Carrie said the matter of the promissory note was nobody's business, not that the obligation of the promissory note was forgiven. As for Jack's testimony, the trial court is free to believe none, part, or all of any witness's testimony. *Salem United Methodist Church v. Bottorff,* 138 S.W.3d 788, 790 (Mo.App. S.D.2004). The trial court was openly dubious of Jack's claim

that Carrie forgave the debt. Jack and Andrew executed a deed of trust to Carrie at the time the promissory note was executed; the deed of trust was never released. The trial court stated that if Carrie had forgiven the deed, she would have executed a deed of release releasing the deed of trust. Because Carrie did not execute a deed of release, the trial court doubted the testimony that Carrie forgave the debt. Thus, the trial court was free to disbelieve Jack's testimony and find that Carrie did not forgive the debt. The trial court's finding that a renunciation had not occurred under section 400.3–604(a)(ii) was not error.

■ Jack's second renunciation argument is that the promissory note was destroyed as contemplated by section 400.3–604(a)(i). Jack's testimony was offered to prove that the promissory note was destroyed. He was asked if, after Carrie forgave the debt, she gave him the promissory note, and Jack replied: "I didn't have the note. No. She must have torn it up, I guess. I don't—." Jack did not testify that the promissory note had been destroyed; instead, he testified that it must have been destroyed because no one could find it. On appeal, Jack argues that, since the original promissory note was not located and no explanation was provided as to its whereabouts, the logical inference is that the promissory note was destroyed. He cites no authority in support of this inference, however. Even if one could infer that the promissory note were destroyed because it was not located, no evidence was presented that the promissory note was destroyed as the result of an intentional voluntary act by Carrie, the holder of the note, as required by section 400.3–604(a)(i). As noted, the trial court was suspicious of the argument that the debt was renounced because the deed of trust was never released. Given the ab-

sence of evidence that a deed of release was signed by Carrie and absence of substantial evidence that the promissory note, if destroyed, was done voluntarily and intentionally, the trial court's finding that renunciation did not occur as provided by section 400.3–604(a)(i) was not error.

Jack's final argument is that an oral agreement was made to discharge the remaining debt for which valuable consideration was given. Jack testified that he had done many things for his mother over the years, including repairing, maintaining, and improving rental properties owned by Carrie. He further testified that, when Carrie forgave the obligation due under the promissory note, she did so because of the various services and work he had done for her. He claims that the services and materials he provided were the valuable consideration supporting the oral agreement to discharge the debt. No evidence was presented at trial that Carrie and Jack entered into an oral agreement whereby she would discharge the debt in exchange for Jack's services except Jack's testimony. He said that Carrie informed him that he was no longer required to make additional payments to satisfy the provisions of the promissory note because he had performed work for her. According to him, there was no agreement, only forgiveness of the debt. Thus, Jack's testimony addresses his contention, previously addressed, that his mother forgave the debt, not that the two had entered into an agreement that Carrie would accept Jack's labor in as satisfaction for the debt represented by the promissory note. No agreement existed, and consideration was not provided for a nonexistent agreement.

Point denied.

### Jack Williams' Point V

Jack argues, as his fifth point on appeal, that the trial court erred in removing him as personal representative of Carrie's estate because he failed to inventory and collect the promissory note, and he failed to timely file federal and state estate tax returns. He argues that no obligation was owed under the promissory note and that no harm to the estate resulted from his misfeasance of failing to file tax returns. He continues to assert that before Carrie's death, she extinguished his legal obligation to satisfy the promissory note as support for this claim, and he asserts that no evidence was presented that the taxing authorities assessed any penalties, interest, or other penalty against the estate as a result of his failure to file tax returns.

Section 473.140 states the following:

If any personal representative becomes mentally incapacitated or is convicted of a felony or other infamous crime, or becomes an habitual drunkard, or in any manner incapable or unsuitable to execute the trust reposed in him, or fails to discharge his official duties, or wastes or mismanages the estate, or acts so as to endanger any corepresentative, or fails to answer any citation and attachment to make settlement, the court, upon its own motion, or upon complaint in writing made by any person interested supported by affidavit, after notice to the personal representative, and to the attorney of record, if any, of any personal representative who cannot be served with notice in this state, shall hear the matter and may revoke the letters granted.

"A proceeding for revocation and removal under this section can be had only upon grounds mentioned in the statute and for causes arising after appointment." *Tuchschmidt v. Tuchschmidt*, 861 S.W.2d 741, 744 (Mo.App. E.D.1993).

The trial court removed Jack as personal representative for failure to discharge his official duties. It found that he failed to inventory and collect the promissory note and failed to file timely federal and state estate tax returns. Jack argues that he had no duty to collect the promissory note because its obligation did not exist and, thus, he was not required to inventory the non-existent debt. He refers to his earlier points relied on. This argument is unpersuasive for the reasons set forth in the analysis of his earlier points relied on. Thus, an outstanding obligation stated in the promissory note existed, and Jack failed to inventory the note and attempt to collect it. As personal representative, Jack had a duty to accurately inventory estate property. *In re Estate of Foster*, 878 S.W.2d 896, 899 (Mo. App. E.D.1994). He failed to do so. His removal as personal representative is warranted by section 473.140. Jack acknowledged that he failed to timely file legally required tax returns with both federal and state officials. Because the court was warranted by section 473.140 to remove Jack as personal representative, whether his failure to file the tax returns constituted sufficient grounds for his removal as personal representative need not be determined.

Jack claims that he performed his duties in good faith and cites the rule that, "where the personal representative (or administrator) acts in good faith and the personal representative's actions, though wrongful, do not harm the estate, removal is not proper." *Cook*, 100 S.W.3d at 929. His failure to inventory and collect the promissory note harmed the estate. The estate was undervalued by approximately $100,000. Further, Jeanette was forced as an heir to bring an action for discovery of assets, which prolonged settlement of the estate and delayed distribution of the estate to the heirs.

Point denied.

### Jack Williams' Point VI

In his sixth point on appeal, Jack argues that the trial court erred in finding that neither he nor any attorney employed by him in his capacity as personal representative were entitled to receive any compensation from Carrie's estate for services rendered. He asserts that the trial court's finding is not supported by substantial evidence, is against the weight of the evidence, and erroneously declares and applies the law. He asserts that a personal representative is entitled to the statutory fee unless his actions have harmed the estate and that attorneys hired by the personal representative are entitled to the statutory fee unless a determination is made that the statutory fee is inappropriate. He further claims that, under any circumstances, attorneys are entitled to the reasonable value of the services rendered, which benefited the estate. Jack also claims that no evidence was presented upon which the court could have determined: his acts harmed the estate, what the benefit of services rendered to the estate was, or the reasonable value of services rendered to the estate. Finally, he argues that no evidence was presented justifying denial of attorney fees.

Section 473.153 governs and provides for compensation of personal representatives, accountants, and attorneys in the administration of an estate. Section 473.153.6 states:

Compensation properly allowable hereunder may be allowed to personal representatives or attorneys upon final settlement, or partial compensation upon application therefor, at any time or times during administration. If the court finds that a personal representa-

tive has failed to discharge his duties as such in any respect it may deny him any compensation whatsoever or may reduce the compensation which would otherwise be allowed. If the court finds that any attorney's services or actions in connection therewith are wrong, improper or injurious to the estate, no attorney fee whatever shall be allowed.

Pursuant to this section, the trial court denied Jack, as personal representative, and any attorney employed by Jack in his capacity as personal representative, any compensation from the estate for services rendered.

Jack argues that the trial court erred in denying him compensation as personal representative. He claims that he did not fail to discharge his duties. He relies on the argument presented in his fourth point relied on that the promissory note was not an asset of the estate and, thus, his failure to inventory it was not malfeasance. This argument is denied for the reasons stated in the analysis of point four. The trial court's finding that the promissory note was an estate asset is affirmed, and failure to inventory and collect upon it harmed the estate. Jack's removal as personal representative was not error, and denying him compensation for his service as personal representative was also not error.

■ Jack also argues that the trial court erred in denying any attorney employed by him in his capacity as personal representative compensation. Section 473.153.6 states that an attorney shall not receive compensation if the attorney's services or actions are "wrong, improper or injurious to the estate." Jack argues that no evidence was presented from which the trial court could determine that any attorney acted in such manner. Jack is correct. At trial, no evidence was presented regarding whether Jack employed an attorney or what services the attorney pro-

vided. The trial court could not have determined that any lawyer hired by Jack acted improperly because the trial court was presented with no evidence regarding what services any lawyer provided or failed to provide.

The point is denied as to compensation for Jack as personal representative. The point is granted as to attorney's fees. The portion of the judgment denying compensation from the estate to any attorney employed by Jack in his capacity as personal representative of Carrie's estate is reversed.

### Jeanette Cordes' Point I

In her sole point on appeal, Jeanette complains that the trial court erred in finding that Andrew's obligation on the promissory note was extinguished upon Andrew's transfer of his entire ownership interest in R.V. Williams Lumber and Building Materials Company, Inc. to Jack. She claims the finding is not supported by substantial evidence, is against the weight of the evidence, and erroneously declares and applies the law. She asserts that Andrew's transfer of his interest in R.V. Williams Lumber and Building Materials Company, Inc. to Jack does not transfer his obligation under the promissory note, that Andrew did not plead or raise the defense of novation at any time, and that no evidence was presented that Carrie intended to extinguish Andrew's obligation under the promissory note.

Jack and Andrew entered into a contract for the purchase of R.V. Williams Lumber and Building Materials Company, Inc. on November 24, 1970. Jack and Andrew, along with their wives, executed a promissory note and deed of trust in favor of Carrie on August 1, 1971. In December 1971, Andrew determined that he no longer wanted to own an interest in the business and desired to move to another state.

He transferred his ownership interest in R.V. Williams Lumber and Building Materials Company, Inc. to Jack and subsequently moved to another state. Andrew never made a single payment on the promissory note and was not involved with the business in any way after that time. Carrie was aware that Andrew had changed his mind and transferred his interest in the business to Jack. Carrie never requested that Andrew make payments under the promissory note. No formal agreement was made between Andrew and Carrie releasing Andrew from the obligations of the promissory note.

The trial court found that the promissory note was an asset of the estate with a value of $100,580.13 but that enforcement of the provisions of the note were barred by the statute of limitations. The trial court further found that Jack's share of the estate should be offset by the value of the promissory note. It found that Andrew's liability under the promissory note was extinguished upon the transfer of his interest in the business to Jack with Carrie's knowledge.[5]

■ Jeanette complains on appeal that the trial court erred in determining that Andrew was not liable at the time of the trial for the terms of the promissory note. The trial court found that Andrew had been liable under the terms of the promissory note when he signed it. Andrew

does not dispute this. The trial court further found that Andrew's liability was extinguished in December 1971, when he transferred his interest in the business to Jack. Jeanette argues that Andrew's act of transferring his interest in the business to Jack did not extinguish his liability under the promissory note. She argues that the judgment does not provide a legal basis upon which Andrew's liability was extinguished. She asserts that the only possible legal basis that would extinguish Andrew's liability is novation and demonstrates that novation had not occurred. Andrew admits that there was not a novation.

Andrew argues that although he signed the promissory note in August 1971 and was then obligated to Carrie under the terms of the promissory note, his liability ceased when he transferred his interest in the business to Jack. At trial, Andrew testified that he "signed everything over to" Jack and that Carrie was aware of the agreement between Jack and himself. This was an agreement between Jack and Andrew only and Andrew was unable to produce a written agreement or a copy of the agreement. Transferring his interest in the business to Jack without more did not relieve Andrew of his liability under the promissory note. When Andrew and Jack acquired R.V. Williams Lumber and Building Materials Company, Inc. three

---

5. Andrew questions whether this court has jurisdiction. He notes that the trial court found that his liability under the promissory note was extinguished when he transferred his interest in the business to Jack. This was a finding of fact. The judgment does not address Andrew's liability in its conclusions of law or in the last part of the judgment, wherein the trial court made various orders. Thus, the judgment does not explicitly rule on Jeanette's claim against Andrew. He states the following: "However, because the order contains a 'finding' that any obligation [Andrew] has been 'extinguished,' a dismissal for lack

of jurisdiction would be exalting form over substance. The clear intent of the order is to deny [Jeanette's] claim against [Andrew]." Jeanette's petition for discovery of assets alleged that both Jack and Andrew were liable under the promissory note. The trial court explicitly found that Andrew was not liable and that Jack was liable. It further ordered that Jack's share of the estate be offset by the amount of his liability under the promissory note. The judgment addressed Jeanette's claims against both Jack and Andrew and was final. This court has jurisdiction.

documents were executed: a purchase agreement, the promissory note, and a deed of trust. These were three distinct legal documents. *See, e.g., Bank of Houston v. Milam,* 839 S.W.2d 705, 707 (Mo. App. S.D.1992); *Boydston v. Bank of Camden Point,* 141 S.W.2d 86, 88 (Mo. App.1940). The promissory note was a mechanism to finance the intent of the parties when the contract was signed, the transfer of the business ownership to the two brothers by their mother. Carrie accepted the note as a promise to pay money as reflected by the terms of the note. The note constituted a separate legal document and a separate obligation, unaffected by ownership of the family business after Carrie transferred her interest in the business to her sons. Any agreement that the brothers had regarding transfer of either of their interest in the business did not affect the obligation of the brothers to pay their mother as required by the note. For the requirements of the note to be altered or forgiven by Carrie required substantial evidence of her changed intent.

The trial court made the following finding:

> Any obligation Andrew had on the promissory note executed in favor of Carrie was extinguished upon the transfer by Andrew of all of his ownership interest in R.V. Williams Lumber and Building Materials Company, Inc. to Jack and that the transfer occurred with the knowledge of Carrie many years prior to her death.

The court's finding was incorrect. The evidence was insufficient that Carrie forgave Andrew's obligation expressed by the note. Andrew and Jack are jointly and severally liable under the promissory note. *See Landmark KCI Bank v. Marshall,* 786 S.W.2d 132, 136 (Mo.App. W.D.1989). The fact that Carrie knew Andrew transferred his interest in the family business to Jack does not alter Andrew's liability. Thus, unless Andrew can show by some other substantial evidence that his liability under the promissory note was extinguished, he too is liable, and his share of the estate should also be offset by the value of the promissory note, pursuant to the doctrine of equitable retainer. *See* § 473.630.

Andrew first argues Jeanette's request that the value of the promissory note be deducted from her brothers' shares of the estate is moot because the promissory note was barred by the statute of limitations at the time of trial. He asserts that Jeanette is receiving what she requested in that the value of the promissory note is to be deducted from Jack's share of the estate and she should not care whether the value of the promissory note is satisfied from Jack's share only or Jack and Andrew's share. This argument fails. The value of the share of the estate each heir will receive was not determined as of the date judgment was entered. It is not certain whether Jack's share will meet or exceed the value of the promissory note. It is possible that Jack's share will be insufficient to cover the full value of the promissory note.

Andrew also argues that any recovery on the promissory note should come from Jack's share of the estate as a matter of fairness. He notes that the probate court in a discovery of assets proceeding is "afforded inherent power of the circuit court to adjust equities between the parties without rigid adherence to any form and may shape the remedy to meet the demands of justice." *In re Estate of Boatright,* 88 S.W.3d 500, 505 (Mo.App. S.D. 2002). The trial court found that Andrew's liability under the promissory note was extinguished by virtue of the transfer of his interest in the business to Jack. It did not find that Andrew was not liable under the promissory note because of eq-

uitable principles. Further, the authority relied upon by Andrew asserts that the trial court is permitted to utilize equitable remedies. It does not suggest that the trial court may do whatever it deems fair. The trial court in this case did not apply a specific equitable remedy to relieve Andrew of liability.

Andrew next incorporates and adopts Jack's brief and his first four points relating to value of the promissory note and whether the note is an asset of the estate. Jack's first four points were denied, and Andrew's reassertions of the points are also denied. The only variation is that, unlike Jack, Andrew attempted to plead generally the application of a statute of limitations as an affirmative defense. He did not establish at trial that the promissory note was barred by the statute of limitations, however. Andrew had the burden of proving that the promissory note was barred by the statute of limitations at the time of Carrie's death. *Clayton Ctr. Associates. v. W.R. Grace & Co.*, 861 S.W.2d 686, 690 (Mo.App. E.D.1993). Jack and Andrew failed to present evidence regarding what the applicable statute of limitations was, when it began to accrue, and when it ran.[6] This is precisely why Jack's claim that his pleadings were amended to assert the affirmative defense of statute of limitations in conformity to the evidence was without merit. Thus, Andrew failed to prove that the promissory note was barred by the statute of limitations at the time of Carrie's death.

Andrew next argues that he was "released" from his obligation under the promissory note and that his liability was "discharged." Jeanette asserts that this could only be done through a novation and that no novation occurred. Andrew con-

cedes that there was not a novation. He states: "Instead, the defense and ruling was simple. A mother decided to forgive her son's co-obligation on a note when he left the lumberyard business. It was a gift, pure and simple." He then sets forth the elements of an inter vivos gift and asserts that they were satisfied.

"Under Missouri law, the essential elements of an inter vivos gift are: 1) the donor's present intent to make a gift; 2) the donor's delivery of the property to the donee; and 3) the donee's acceptance of the gift, whose ownership takes effect immediately and absolutely." *Clippard v. Pfefferkorn*, 168 S.W.3d 616, 618 (Mo.App. E.D.2005). Insufficient evidence was presented at trial to support a finding that Carrie made an inter vivos gift to Andrew of his obligations under the promissory note. According to Andrew's testimony, he decided to leave the business and transferred his interest in the business to Jack. This was an agreement between Jack and Andrew. While Carrie was aware of the transfer, she was in no way involved. By all accounts, this was Andrew's idea, Jack concurred, and Andrew interacted with Jack to effectuate Andrew's removal from the family business. After the transfer occurred, the evidence was that Andrew never made payments required by the note and Carrie never compelled Andrew to make payments. That is not sufficient substantial evidence of an inter vivos gift. No additional evidence was presented that Carrie intended to relieve Andrew of his obligation, that any form of delivery occurred, symbolic or actual, or that Andrew accepted a gift. That Carrie did not request that Andrew make payments does not establish that Carrie gifted to Andrew his liability under

---

6. The court's review of the transcript failed to show that any evidence pertaining to these topics was presented and neither Jack nor Andrew direct the court to pages in the transcript indicating otherwise.

the promissory note. Andrew argued that: "if you knew my mother ... you would know she wouldn't make me responsible." He claims that his understanding of his mother's personality is sufficient evidence that Carrie made a gift to him. This statement, even if accepted as evidence of Carrie's intent, reflects that, despite Andrew's obligation under the promissory note, Carrie would not have enforced her right to collect from Andrew and is insufficient evidence that Carrie intended to gift Andrew his obligations under the note. It does not indicate that Andrew did not have a continuing obligation under the promissory note or that his mother relieved him of the obligation. Thus, insufficient evidence was presented of an inter vivos gift, and Andrew's obligation under the promissory note could not have been extinguished by a gift.

Andrew also argues that if he is liable, interest was calculated incorrectly. He uses the argument Jack asserted in his first point. This argument is unpersuasive for the same reasons set forth in the analysis of Jack's first point.

Andrew signed the promissory note and became liable thereunder. His subsequent transfer of his interest in the family business did not affect his liability under the promissory note. There was not a novation. Andrew asserts that his obligation was extinguished by virtue of an inter vivos gift. Insufficient evidence was presented to support a finding that an inter vivos gift had been made. Thus, Andrew is still liable under the promissory note.

 At the time of trial, enforcement of the promissory note at law was barred by the statute of limitations. Because of this, the trial court employed the doctrine of equitable retainer. "The right of equitable retainer or set off against real or personal property is well established in this state." *Old v. Heibel*, 352 Mo. 511,

178 S.W.2d 351, 353 (1944). Section 473.630 states:

> When a distributee of an estate is indebted to the estate, the amount of the indebtedness if due, or the present worth of the indebtedness, if not due, may be treated as an offset by the executor or administrator against any testate or intestate property, real or personal, of the estate to which such distributee is entitled. An offset hereunder shall be treated as if made as of the time of the death of the decedent and interest shall be adjusted accordingly.

That the promissory note is barred by the statute of limitations does not impact the application of this doctrine, and no party argues otherwise. *See Leach v. Armstrong*, 236 Mo.App. 382, 156 S.W.2d 959, 961 (1941)(applying equitable retainer doctrine to debt discharged in bankruptcy and stating: "There is a well-balanced opinion by the Supreme Court of Missouri that holds that a debt, the liability for which has been extinguished by limitation, is no bar to the application of equitable retainer."); *Johnson v. Johnson*, 352 Mo. 787, 179 S.W.2d 605, 609 (1944).

 Pursuant to this doctrine, the trial court determined that Jack's share of Carrie's estate is to be offset by the value of the promissory note. § 473.630. As concluded, *supra*, Jack and Andrew are jointly and severally liable under the promissory note. Further, at the time of trial, whether Jack's share of the estate would be sufficient to satisfy the full obligation owed under the promissory note was unknown. The doctrine of equitable retainer should be applied to both Jack and Andrew's share of the estate so that the estate will be fully compensated for the outstanding obligation under the promissory note.

A question, therefore, is the manner by which the doctrine will be applied to this

case. Several options are apparent but not necessarily exclusive. The obligation owed under the promissory note could be satisfied first from Jack's share of the estate and then from Andrew's share of the estate in the event that Jack's share is not sufficient. The obligation owed under the promissory note could be satisfied equally from Jack and Andrew's shares of the estate. The obligation could be satisfied in some other manner, divided between Jack and Andrew's shares in a proportion the trial court deems equitable. The matter is remanded to the trial court so that it may properly examine the equities of this matter and determine the manner in which the doctrine of equitable retainer is applied to both Jack and Andrew, consistent with this opinion.

Point granted.

## Conclusion

Jack's first five points are denied. His sixth point is granted as to attorney's fees but denied as to his compensation as personal representative. Jeanette's point is granted, and the matter is remanded to permit the trial court to determine the manner by which Jack and Andrew's shares of the estate shall be offset by the value of the promissory note.

All concur.